**PORTLAND RESIDENCE, INC.,**
**Petitioner, Appellant,**

v.

**MINNESOTA DEPARTMENT OF**
**PUBLIC WELFARE, Respondent,**

**and**

**George Gaylord, et al., Intervenors,**
**Respondents.**

**No. 48406.**

Supreme Court of Minnesota.

Jan. 12, 1979.

---

Broeker, Hartfeldt, Hedges & Grant, Steven P. Hedges and William J. Wernz, Minneapolis, for appellant.

Warren Spannaus, Atty. Gen., Richard B. Allyn, Sol. Gen., Paul G. Zerby, Asst. Atty. Gen., Richard S. Slowes, Sp. Asst. Atty. Gen., St. Paul, Rebecca Knittle, Legal Advocacy for the Developmentally Disabled of Minnesota, Minneapolis, for respondents.

Heard before ROGOSHESKE, PETERSON, and YETKA, JJ., and considered and decided by the court en banc.

PETERSON, Justice.

Portland Residence, Inc. (Portland), appeals from a judgment and order of the Hennepin County District Court affirming the order of the commissioner of the Department of Public Welfare (DPW) which established the per diem reimbursement rate for Portland's residents.

In December 1975 Portland purchased the residential facility for the mentally retarded owned and operated by Outreach Community Center, Inc. (Outreach). Because the facility's license had expired on November 1, 1975, Portland applied for a new license pursuant to Minn. Rule DPW 34 (hereinafter Rule 34). DPW licensed the facility effective January 1, 1976, and authorized Portland to increase its staff by 10 resident counselors, 2 social workers, and 1 nurse to meet the requirements of Rule 34.

Residents of the Portland facility receive governmental assistance through the Medical Assistance Program or the Cost of Care Program to defray the cost of their care. DPW determines the per diem reimbursement rate for such payments pursuant to Minn. Rule DPW 52 (hereinafter Rule 52).[1] In March 1976 Portland submitted a cost report to DPW containing historical cost information from the prior owners and information concerning known cost changes, and requesting an interim rate of $32.70. DPW denied the requested interim rate in May 1976 but granted Portland a temporary rate of $20.06, which was a 15-percent increase over the 1975 rate paid to Outreach.

On October 8, 1976, DPW issued a final rate determination of $22.90.[2] Portland appealed, and four residents of the facility intervened. The hearing examiner increased the rate to $23.78 to include the increased cost of real estate taxes. The commissioner adopted the findings of the hearing examiner as the final decision of DPW. Portland sought judicial review pursuant to Minn.St. 15.0424, and the Hennepin County District Court affirmed the commissioner's order.

The issues presented by this appeal are: (1) Whether Rule 52 applies to new owners of existing residential facilities for the mentally retarded; (2) whether the staffing ratios specified in 45 CFR § 249.13 (1976)[3] were a minimum, immediate requirement of federal law in March 1976; and (3) whether Portland was entitled to a reimbursement rate greater than $23.78 because of major program changes allegedly approved by DPW.

The parties contend that these issues are solely questions of law and, thus, the record

1. This appeal does not concern the 1977 amendments to Rule 52. All references are to the 1976 version of the rule.

2. This rate included the cost of the 13 additional staff positions authorized by DPW. Because these positions were mandated by Rule 34, the cost of these positions was not subject to the 15-percent overall rate limitation. Rule 52, II. D.2.

3. On September 30, 1977, 45 CFR § 249.13 was renumbered at 42 CFR § 449.13. 42 Fed.Reg. 42827 (1977).

of the administrative hearing is unnecessary to our decision. But questions of law are not decided in a vacuum; the law must be applied to particular factual situations. A thorough examination of the record leaves unanswered questions concerning the appropriate application of the law in the unusual circumstances of this case. Therefore, we find it necessary to remand the case to the administrative agency for further proceedings.

Rule 52 prescribes a cost-related system for reimbursing facilities for the mentally retarded but does not reimburse for actual costs through retroactive settlements. Rule 52, I.B. For newly built or newly established facilities which have no previous welfare rate, DPW establishes an interim rate based on projected costs. This rate is adjusted after 6 or 12 months, when actual cost information is available. Rule 52, III. C.1.c.

For existing facilities, the reimbursement rate is established yearly based upon the previous year's welfare rate plus known cost changes, e. g., the increased cost of salaries, facilities, and equipment. Rule 52, II.A.1. and II.A.3.a. Increases in the reimbursement rate are limited to 15 percent over the previous welfare rate unless such changes are necessary to satisfy minimum, immediate requirements imposed by federal, state, or local law. Rule 52, II.D.2.

Rule 52 does not provide a different procedure for establishing a reimbursement rate when a new owner purchases an existing facility. Under ordinary circumstances the new owner's reimbursement rate is based on the welfare rate of the prior owner and is adjusted to reflect the new owner's greater investment in the facility. Rule 52, IV.C.1.b. All other cost increases due to change in ownership are subject to the 15-percent overall rate limitation unless such cost increases are necessary to satisfy minimum, immediate requirements of federal, state, or local law. Rule 52, II.D.2.

Under the facts of this case we note that Portland is neither a newly established facility nor merely the new owner of an existing facility, but a hybrid of the two. Outreach had run the facility as a nonprofit corporation and utilized volunteers to augment the staff. Portland operates the residence as a proprietary facility. In order to relicense it pursuant to Rule 34, Portland was required to hire 13 additional staff members. It also instituted radical programming and staffing changes to comply with the objectives of Rule 34. In addition it altered the physical structure to satisfy the requirements of state and federal law that living conditions in facilities for the mentally retarded be as close to a normal living situation as possible.

We believe that the substantial changes required of Portland distinguish it from the ordinary case where a facility changes ownership without changes in staff, programming, and the physical structure. We do not decide, however, whether Portland should be treated as a newly established facility under the facts of this case, or whether it should be limited to Outreach's welfare rate plus the overall rate limitation. The major dispute between Portland and DPW concerns staffing. The answer to this dispute depends on whether certain staffing ratios were minimum, immediate requirements imposed by federal law in 1976.

At the time DPW licensed Portland's facility, the state regulation did not contain specific staffing ratios. Rule 34 does require that all residential facilities for the mentally retarded comply with the applicable federal regulations. Rule 34, I.A.3.

In March 1974 the Department of Health, Education, and Welfare (HEW) proposed detailed regulations governing residential facilities for the mentally retarded including specific staff-to-resident ratios. 45 CFR § 249.13 (1974); 38 FR 5974 (1974). Based on numerous comments, HEW determined that the proposed standards were too detailed and the professional resources too scarce to demand immediate compliance. Therefore, it delayed implementation for 3 years and promulgated a modified version for the interim. 45 CFR § 249.12 (1974); 39

FR 2220 (1974).[4] Both regulations provided that residential facilities for the mentally retarded were to meet the standards in § 249.13 no later than March 18, 1977.[5] If they met the standards prior to that date, they were no longer required to satisfy § 249.12.

The cost of achieving compliance with § 249.13 is exempt from the 15-percent overall rate limitation of Rule 52 only if that regulation is a minimum, immediate requirement. Whether it is depends on the meaning of the term "immediate." This term cannot mean that the cost of achieving compliance would be exempted from the 15-percent overall rate limitation only on March 18, 1977. The facility must be given some time prior to March 18, 1977, in which to locate and hire "sufficient, appropriately qualified and adequately trained personnel" or to provide the opportunity for job orientation and training. The exact length of time required must be reasonable under the particular circumstance and depends on the type of staff and their availability in the job market.

The record in this case provides no clues. Although it suggests that DPW considered 2 months to be reasonable, it is unclear whether this was a general DPW guideline or the time DPW considered reasonable under the particular facts of this case. While 2 months might be reasonable in some cases, it might be excessive in others and insufficient in still others. We cannot determine whether or not it would be reasonable in this case. We do feel that 12 months would be unreasonable under these facts. To hold otherwise would render the term "immediate" meaningless.

Our conclusion does not resolve the dispute however. The record does indicate that the Department of Health, which is responsible for inspecting facilities for compliance with federal requirements, monitored Portland's facility in February 1976 for compliance with § 249.13. At that time it submitted a report to Portland showing that Portland did not meet the lowest staff-to-resident ratio of 1 to 5. Portland noted on the report that it would hire the necessary staff by June 1976. When Portland's program director met with a representative from the DPW licensing division to discuss staffing, that representative neither formally approved the staff changes nor actively discouraged them. The record shows that Portland did significantly increase its staff in May and June 1976.

Because of the inadequacy of the record, we remand this case to the administrative agency. On remand the staffing ratio of § 249.13 should be considered a minimum, immediate requirement for Portland if Portland reasonably believed it was necessary to hire additional staff based on the Department of Health's report and if DPW encouraged this belief by not clarifying for Portland exactly how many staff would be reimbursed pursuant to Rule 52.

Moreover, we are unable to determine why only 13 positions were determined to be necessary to meet the requirements of Rule 34. It is clear that the Department of Health required the nurse and that Portland requested the other 12 positions when it applied for its license on December 31, 1975. There is no showing that either the Department of Health or DPW made an independent assessment of the number of staff required to achieve the objectives of Rule 34. It is possible that if Portland had requested more than 12, whatever number had been requested would have been considered a minimum, immediate requirement of Rule 34. If this were so, it would be unfair to limit Portland to the 12 requested on December 31, 1975, before Portland had time to assess its needs. In addition, we are unable to determine from the record if the cost of such staff would be reimbursed by federal funds or if state funds are available for this purpose.

---

4. This regulation has been renumbered as 42 CFR § 449.12. 42 FR 42827 (1977).

5. On March 18, 1977, HEW delayed the effective date until July 18, 1977, because of the difficulties of compliance. This delay does not affect the decision in this case, but does indicate the problems of locating and training qualified staff.

Finally, Portland challenges the district court's finding that DPW never approved any major program changes in 1976 and that as a result Portland is not entitled to an increased reimbursement rate. Rule 52, IV.A.1., which permits providers to file amended cost reports, does not provide for an exemption from the overall rate limitation. If the major program changes instituted by Portland were minimum, immediate requirements of federal, state, or local law, Portland is entitled to the cost of such changes. If they are not, they are subject to the overall rate limitation and Portland would not be entitled to an increased reimbursement rate because it had already received the full 15-percent increase over Outreach's welfare rate. Because the major program changes involve staffing, the answer to this issue depends on whether 52 CFR § 249.13 was a minimum, immediate requirement in 1976.

Remanded to district court for remand to the administrative agency for proceedings consistent with this opinion.

OTIS, J., took no part in the consideration or decision of this case.